WALCO INVESTMENTS, INC.,
et al., Plaintiffs,

v.

Kenneth THENEN, et al., Defendants.

No. 93–2534–CIV.

United States District Court,
S.D. Florida.

Oct. 23, 1996.

Harley S. Tropin, Miami, FL, Receiver for Premium Sales Corp.

Marc Cooper, Cooper & Wolfe, P.A., Miami, FL, for the Receiver.

David Berger, Stephen Whinston, Berger & Montagne, P.C., Steering Committee, Philadelphia, PA.

Michael A. Hanzman, Hanzman & Criden, P.A., Steering Committee, Miami, FL.

Dean Colson, Joseph M. Matthews, Enid Duany Mendoza, Colson, Hicks, Eidson, Colson & Matthews, P.A., Steering Committee, Miami, FL.

Aaron Podhurst, Podhurst, Orseck, Josefberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, FL, for Liaison Entities.

Steve Turner, U.S. Department of Justice, Office of the U.S. Trustee, Miami, FL.

Charles Harper, U.S. Sec. & Exchange Comm'n, Miami, FL.

Edward Stamm, Ass't U.S. Attorney, S. District of Florida, Miami, FL.

Michael Stengel, Memphis, TN, for Kelly Thomas.

Steve Naturman, Jerry M. Markowitz, Markowitz, Davis and Ringle, Miami, FL, for County Nat'l Bank.

Neil Flaxman, Coral Gables, FL, for Mike Flynn.

Paul Singerman, Strook & Strook & Lavan, Miami, FL.

Laurie S. Whittaker, Whittaker and Whittaker, P.A., North Miami, FL, for Premium Sales of Miami, Ltd. and Premium Sales Management, Inc., Jack Yoches.

Mark P. Schnapp, Holly Skolnick, Greenberg, Traurig, Miami, FL, for Deckelbaum Defs.

Jane W. Moscowitz, Baker & Moscowitz, Miami, FL, for PSEC Defendants.

Richard E. Brodsky, P.A., Miami, FL, for Larry and Neil Sazant.

David M. Levine, McDermott, Will & Emery, Miami, FL, for Expo Associates, Inc.

Stanley Wakshlag, Akerman Senterfeit Eidson, P.A., Miami, FL, for Capital Bank.

Jeffrey H. Beck, Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.A., Ft. Lauderdale, FL, for DBRN Limited Partnership and Meldin, Inc.

Charles Pugatch, Ft. Lauderdale, FL, for Demets.

David M. Fromer, New York City, Pro Se.

Larry D. Yogel, Bala Cynwyd, PA, Pro Se.

Alvin Davis, Steel, Hector & Davis, Miami, FL, for (92); Cimbs Inv. (92), Inc.; Hawco Equities, Inc.; & Henry and Leslie Weitzman.

Hugo L. Black, Jr., Joseph W. Beasley, Jr., Kelly, Black, Black, Byrne & Beasley, P.A., Miami, FL, for Pueblo Int'l.

Stephen H. Cypen, Cypen & Cypen, Miami Beach, FL, for Pueblo Int'l.

Eric Lee, Jan Douglas Atlas, Atlas Pearlman Trop & Borkson, P.A., Ft. Lauderdale, FL, for Hank Bleier and HB Investments, Inc., HB Investments, II.

Mel Brink, Livermore, CA.

Malcolm Fromberg, Gary Dumas, Fromberg, Fromberg, Lewis & Brecker, Aventura, FL, for Charlie Valvo.

Joel Hirschhorn, Coral Gables, FL, for Zvi Yuz, Peter Arak, Maccabi Food Corp., Carmel Food Corp., Maccabi Food Miami, Ltd., Carmel Food Miami, Ltd. & Golani Food Miami.

Andrew Cotzin, Broad and Cassel, Miami, FL, for Defs. Marvin Biltis; Prestige Inv. Ltd.; Miracle Inv. I; Miracle Inv. IA; Miracle Inv. IB; Parkland Inv.; Bilmar Capital; and Bilmar Sales, Inc.

Sue Price, Ft. Lauderdale, FL, Pro Se & for Marathon Enterprises.

Herbert Stettin, Miami, FL, for Def. Malone & Hyde, Inc. and Fleming Companies, Inc.

Reid E. Robison, McAfee & Taft, Oklahoma City, OK, for Fleming Co., Inc. and Malone & Hyde, Inc.

James F. Gilbride, Gilbride, Heller & Brown, P.A., Miami, FL, for Daniel Morris.

Stanley A. Beiley, Hornsby, Sacher, Zelman, Stanton, Paul & Beiley, P.A., Miami, Florida, for Premium Sales, 1990, Ltd.; Premium Special Purchases, Ltd.; Premium Income Advantage Fund, Ltd.; Can–Am; and General Partnership of Sherry Walde, Trustee.

Barry D. Hunter, Brown, Todd & Heyburn, PLLC, Lexington, Kentucky, for Premium Sales, 1990, Ltd.; Premium Special Purchases, Ltd.; Premium Income Advantage Fund, Ltd.; Can–Am; and General Partnership of Sherry Walde, Trustee.

Lawrence M. Schantz, Schantz, Schatzman & Aaronson, Miami, FL, for Stern.

Steven R. Woods, Miller & Woods, West Palm Beach, FL, for Longs Drug Stores of California, Inc.

Fred M. Cohen, Rancho Cucamonga, CA, for Shirley.

Isaac J. Mitrani, Mitrani, Rynor & Gallegos, P.A., Miami, FL, for Sherry Walde.

B. Wayne Olivie, Miami, FL, for Dean Henrichs.

John K. Aurell, Ausley & McMullen, Tallahassee, FL, for Cadwalader, Wickersham & Taft.

Vincent Connelly, Mayer, Brown & Platt, Chicago, IL, for Baker & McKenzie.

Michael Nachwalter, Kenny, Nachwalter, Seymour, Arnold, Critchlow & Spector, P.A., Miami, FL, for Baker & McKenzie.

Edward Moss, Anderson, Moss & Sherouse, P.A., Miami, FL, for Harris Mitchell; Harold Sazant; Irwin Altman ["The Marg Corp. directors"].

Mark Hicks, Hicks, Anderson & Blum, P.A., Miami, FL, for Harris Mitchell; Harold Sazant; Irwin Altman; The Marg Corp. ["directors"].

David Schatia, West Mount, Quebec, Canada, Pro Se.

Bernard W. Sultan, Creditors' Committee, North Miami Beach, FL.

Irving Canner, Creditors' Committee, North Miami Beach, FL.

Gary S. Brooks, Zack, Sparber, Kosnitzky, Truxton, Spratt & Brooks, P.A., Miami, FL, for County Nat'l Bank & Lawrence Robinette.

Steven Eisenberg, Hinshaw & Culbertson, Miami, FL, for The Burmans and The Bornsteins.

Daniel L. Silverberg, Los Angeles, CA, for Bernard Schachter, JASAB Inv. and TAJ Inv.

Edward R. Shohat, Bierman, Shohat, Loewy & Perry, P.A., Miami, FL, for Thenen.

S. Alan Stanley, Coconut Grove, FL, for Judith Krovetz.

Steven Mishan, Andrew B. Hellinger, Mishan, Sloto, Hoffman & Greenberg, Miami, FL, for Creditors Committee.

Howard I. Weiss, Henry B. Handler, Weiss & Handler, P.A., Boca Raton, FL, for Def. Feinberg.

Max M. Klass, Phoenix, AZ, for Dean Henrichs.

Bruce J. Berman, Weil, Gotshal & Manges, Miami, FL, for Stanford Trading, Inc.

Marty L. Steinberg, Holland & Knight, Miami, FL, for Fry's Food.

Paul Braid, Coconut Creek, FL, Pro Se.

Norman Malinski, Aventura, FL, for Birdman.

Charles H. Lichtman, Charles H. Lichtman & Assoc., P.A., Plantation, FL, for Consol. Fund of America.

Gary D. Fox, James B. Tilghman, Stewart Tilghman Fox & Bianchi, P.A., Miami, FL, for Lipson/Stern Partnerships.

William C. Hearon, Miami, FL, for Lipson/Stern Partnerships.

Jeffrey M. Weissman, Weissman & Dervishi, P.A., Ft. Lauderdale, FL, for Sheila Klee/Ira Posner and Alba/Arnold Oblonsky.

Kenneth G. Hausman, Helane L. Morrison, Matthew J. Jacobs, Howard Rice Nemerovski Canady Falk & Rabkin, San Francisco, CA, for Long's Drug.

Rudolph F. Aragon, Aragon, Martin, Burlington, Weil & Crockett, P.A., Miami, FL, for Long's Drug.

Stuart H. Singer, Daniel A. Casey, Kirkpatrick & Lockhart, Miami, FL, for The Vons Companies.

Gregory P. Stone, Munger, Tolles & Olson, Los Angeles, CA, for The Vons Companies.

Rosenthal, Rasco & Stok, N. Miami Beach, FL, for Equitable Bank.

Alex Hofrichter, Miami, FL, for Federal Ins. Co.

## MEMORANDUM OPINION DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING THE STANDING OF THE CLASS

MORENO, District Judge.

Class Plaintiffs are individual investors in numerous funding entities whose sole purpose was to provide funds for investment in the Premium Corporations, a diverter of grocery and beauty aid products. Unfortunately for the 1,400 members of the Plaintiff Class, the Premium Corporations were formed to conduct an elaborate "Ponzi" scheme involving sham grocery transactions whereby the funds of new investors were used to pay earlier investors. Both Plaintiffs and movant Defendants claim that the individual Funding Entities, through their promoters, were either participants in or had knowledge of this fraudulent scheme involving non-existent transactions. The Plaintiffs claim that Defendants The Vons Companies, Inc., Pueblo International, Inc., and Stanford Trading, Inc., through their agents or employees, confirmed fictitious grocery transactions, there-

by creating the appearance of a legitimate grocery diverting business. Based on these false confirmations, Class members were fraudulently induced to make their funds available for investment in the Premium Corporations, and this complaint, alleging federal and Florida RICO violations as well as common law fraud, ensued. Because the investors suffered direct injury traceable to the unlawful conduct of the Defendants, including the Funding Entities, the Plaintiffs cannot be required to depend on the Funding Entities to properly pursue their claims. Therefore, the Court finds that the Class has standing to raise claims against all alleged participants in the fraud and DENIES the Defendants' Motions for Summary Judgment.

## BACKGROUND

Lone Star Trading Corporation, Premium Sales Corporation, and Plaza Trading Corporation, and other subsidiaries (the "Premium Corporations") were founded by Ken Thenen and Dan Morris ("the Insider Defendants") in 1986. The Premium Corporations were in the "grocery diverting" business. Diverting involves the practice of buying large quantities of grocery items at discounts offered in limited geographical areas and then reselling these same products at a large profit in other parts of the country where such discounts are not available. Diverting is not in itself illegal.

In order to raise cash to meet their working capital needs, the Premium Corporations offered potential investors an exorbitant rate of return, typically between 25 to 60 percent. All such investments in the Premium Corporations were made through business entities ("Funding Entities") formed exclusively to make funds available for investment in the Premium Corporations which served as the conduit for the fraud orchestrated by the Insider Defendants.

The Funding Entities were organized in different forms. The Expo Associates and its related entities ("Expo") invested directly in the Premium Corporations. The Sazant Funding Entities, which split from Expo sometime in 1989, were limited partnerships, each offering their investors limited partnership shares. The Stern–Lipson Funding Entities were general partnerships, and its investors were general partners given exclusive rights to sue on behalf of the general partnerships. The Stern–Lipson partnerships began to fund transactions for the Premium Corporations sometime in 1989. The Schwartz–Weitzman Funding Entities borrowed investors' funds and then invested these funds in the Premium Corporations. The Yuz and Yoches Funding Entities were limited partnerships which sold limited partnership units.

Defendant Vons is one of the largest supermarket chains, based on sales, in Southern California. Vons was one of the many large supermarkets with which the Premium Corporations did business in the time period from late 1990 to May 1993. Stanford Trading Company ("Stanford") is a Texas corporation engaged in the business of diverting grocery and health and beauty aids. Stanford and its employee Eugene Shirley, who worked on-site at Vons, purchased products from and sold products to the Premium Corporations.

Defendant Pueblo is a wholly-owned subsidiary of Pueblo Xtra International, Inc. Pueblo purchased products from and sold products to the Premium Corporations. Charles Valvo was a buyer charged with responsibility for purchasing and diverting for the purchasing department of Pueblo.

Vons and the other Grocery Defendants (Pueblo, Malone & Hyde, Fleming, and Stanford) engaged in "real" transactions involving diverted products with the Premium Corporations. However, to create the illusion of additional transactions, the Premium Corporations also created false invoices and purchase orders to evidence "fictitious" diverting transactions. The information was transmitted to the grocery confirmers (including Shirley and Valvo), who were allegedly bribed to confirm the fictitious transactions.

From approximately October 1990 to December 1991, Shirley, an employee of Stanford and allegedly an agent of Vons, was bribed by the Premium Corporations to confirm to third parties that transactions had been entered into with Vons when, in fact,

they had not. After learning of Shirley's acceptance of bribes by several diverting companies, Vons demanded that Stanford remove Shirley from their account. Stanford terminated Shirley in December, 1991. However, neither Stanford nor Vons disclosed these facts to any third parties or law enforcement officials, and Vons continued to conduct business with the Premium Corporations. Shirley was subsequently hired by the Premium Corporations.

Pursuant to the "fictitious" purchase orders, the Funding Entities sent money to the Premium Corporations to purchase the products. At the time the purchases were funded, "fictitious" invoices reflected that there was a purchaser for the product. The Funding Entities did not confirm every transaction. The Sazant and Yuz Funding Entities did not confirm any transactions. Zvi Yuz did not tell his investors that any transactions were confirmed. In addition, many Funding Entities sent investors' money to the Premium Corporations prior to confirming.

To the investors, what seemed to be a safe and prosperous venture turned out to be nothing more than a "Ponzi" scheme. In executing this alleged scheme, investors' capital was paid out by the Insider Defendants to themselves and to other investors, with the Insider Defendants falsely characterizing the funds as returns or profits on investments. In May 1993, some investors demanded their money be returned and the entire scheme began to unravel. The investors brought this class action lawsuit against over 100 individuals and entities alleging, among other things, that Vons, Pueblo and Stanford are liable to Plaintiffs for fraud and civil RICO based on their agents' participation in the alleged "Ponzi" scheme, as well as their knowledge of and acquiescence in such scheme.[1]

## STANDING

The standing provision of RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... and shall recover threefold the damages he sustains." 18 U.S.C. § 1964(c) (1988). The Supreme Court has interpreted this language as limiting standing to Plaintiffs whose injuries were proximately caused by the RICO predicate acts. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992). A central element of proximate cause is a showing of some "*direct* relation between the injury asserted and the injurious conduct alleged." *Id.* (emphasis added). In assessing whether the Class has standing to raise the issues alleged in their Complaint, this Court must therefore determine whether the claims raised by Class Plaintiffs are derivative of the claims belonging to the investors' respective Funding Entities, as Vons contends, in which case the Class would lack standing to bring these claims, or whether the claims independently belong to the investors, as the Class contends, in which case the Class would have standing and the claims could proceed.

Vons raises three arguments in support of their contention that the Class Plaintiffs' claims are derivative of the Funding Entities claims.[2] According to Vons, the limited partner investors (the Sazant, Yuz, and Yoches Funding Entities) cannot bring their RICO claims because these Class Plaintiffs are seeking to recover their individual losses, and under Florida law a suit belonging to the partnership cannot be brought on behalf of the individual limited partner. Vons also contends that the general partners who gave their managing general partner the sole authority to bring claims (investors in the Stern–Lipson General Partnership) lack standing to bring these claims themselves. Finally, Vons argues that investors who loaned money (investors in the Schwartz–Weitzman Funding Entities) are mere creditors and as creditors lack standing because a

---

1. Actual knowledge, willfulness, conscious awareness, recklessness, scienter, and other states of mind can always be proven circumstantially.

2. Vons admits that the direct investors (including the Deckelbaum investors and a small number of Biltis investors) and the Funding Entities, which funded the Premium Corporations directly, have standing to raise these claims.

debtor's creditors do not have standing to sue a third party for an injury to the debtor which results in the debtor's failure to pay. Furthermore, according to Vons, in analyzing the injury suffered by the investors and the Funding Entities, the appropriate examination is the similarity of injury suffered by the investors who were investors *at the time the alleged injury occurred.*

Plaintiffs, on the other hand, claim that an injury to an individual is derivative of an injury suffered by an entity in which the individual invested *only* if the injury was suffered by *all* investors in the entity. Plaintiffs argue that the Class Plaintiffs' claims are not derivative of the Funding Entities because members of the Funding Entities that made a profit are not included in the Class, and therefore damages suffered by the Class Plaintiffs are necessarily larger than, and distinct from, the damages suffered by the Funding Entities.

Plaintiffs instead argue that they are suing for their individual damages, not those of the limited partnership Funding Entities or of general partnerships, whom they have also sued. Class Plaintiffs claim that their damages were proximately caused by the Defendants' conduct because the Defendants' acts substantially caused their injuries, and furthermore, their injuries were reasonably foreseeable or anticipated as a natural consequence of these actions. Class Plaintiffs argue that, but for the false confirmations, which made Premium appear to be a legitimate business opportunity, they would not have invested in the Premium Corporations.

On two earlier occasions this Court addressed the standing issue. In ruling on Defendants' Motion to Dismiss, this Court determined that the Plaintiffs had sufficiently pled a cause of action for a direct injury:

> The Defendants essentially set forth that the Funding Entities should sue for fraud instead of the investors in the Funding Entities. Defendants may find that it is easy to prove their point. However, the complaint explicitly states that Defendants' fraud induced "Plaintiffs and the Class to purchase" securities. Since the complaint

alleges a direct injury, the Court must deny this ground of the motion to dismiss.

Order Granting Defendant's Motion to Dismiss in Part at 19 (December 29, 1994). Later, in certifying the Class, this Court rejected, without extensive discussion,[3] the Grocery Defendants' argument that the Plaintiffs should be required to bring their claims through the Funding Entities. At that time, the Court stated:

> The Court cannot require Plaintiffs to depend on the Funding Entities, who the Plaintiffs have accused of participating in the Premium fraud, in order to obtain a recovery.

Order Granting Plaintiffs' Motion for Class Certification at 44–45 (June 27, 1996).

At least two courts have determined, as did this court, that in order to survive at the Motion to Dismiss stage, a Plaintiff need only allege a direct injury caused by Defendant's conduct. For example, in *Dayton Monetary Assoc. v. Donaldson, Lufkin et al.,* 1993 WL 410503 (S.D.N.Y.1993), the Plaintiffs invested in limited partnerships which, they alleged, engaged in fraudulent securities transactions with the Defendants. Plaintiffs alleged that the fraudulent transactions induced the Plaintiffs to invest in the limited partnerships, and thereafter the continuation of the fraudulent transactions destroyed the value of their investments by draining money from the limited partnerships. *Id.* at *1. At the motion to dismiss stage, after dismissing the claims which alleged a direct injury to the limited partnerships, the court concluded that Plaintiffs had *alleged* a sufficient causal link for the court to grant Plaintiffs standing "to sue the Defendants for injuries proximately caused by alleged fraudulent misrepresentations which *caused them to invest in limited partnerships which were worth less than they thought."  Id.* at *2 (emphasis added).

A similar conclusion was reached in *In re Colonial Limited Partnership Litigation,* 854 F.Supp. 64 (D.Conn.1994). In *Colonial,* Colonial Realty and its general partners sold limited partnership interests, offered through

---

**3.** The court followed the advice of Alexander Pope, who said: "Words are like leaves and where they most abound, much fruit of sense is rarely found."

Private Placement Memoranda, in various real estate properties located primarily in the state of Connecticut. *Id.* at 78. Plaintiffs brought suit against the accounting firms, law firms, and appraisal firms which prepared portions of the memoranda in connection with the security offering. *Id.* at 79. Defendant Arthur Andersen moved to dismiss, contending that the only *alleged* injury was the diminution in value of the limited partners' investments. *Id.* at 104. The court denied the motion, noting that Plaintiffs *alleged* a direct injury, that "the Defendant's fraudulent conduct induced them to purchase their limited partnership interests...." *Id.* at 105.

A number of courts have addressed this standing issue and the distinction between direct and derivative claims. One court, without extensive elaboration, held that it is possible for a limited partner to suffer direct damages based on fraud which induced the limited partner to invest in the limited partnership. *Glusband v. Fittin Cunningham Lauzon, Inc.,* 582 F.Supp. 145 (S.D.N.Y. 1984). In *Glusband,* Associates, a limited partnership, was formed for the purpose of investing in securities. *Id.* at 147. Michael Starbuck, Inc. ("MSI"), which exercised exclusive control and management over Associates, solicited investors to buy limited partnership interests in Associates. *Id.* at 147-48. After securities violations were alleged against Defendant MSI, the court appointed Plaintiff as receiver for Associates. *Id.* at 148. The court concluded that the Plaintiff properly asserted Associates' rights in alleging that the partnership assets were depleted due to the fraud of the Defendant. *Id.* at 149. The court, however, also held that the Plaintiff had *"no standing to asset claims which belong solely to the limited partners* in Associates, i.e., claims for any *damages caused by their being fraudulently induced by Defendants to purchase limited partnership interests* in Associates." *Id.* (emphasis added). The court did not indicate whether such a claim was raised by the limited partners, or whether such a claim actually existed under the facts of that case.

Another court analyzing the standing requirement focused on the duty owed to individual partners. *Fulco v. Continental Cablevision, Inc.,* Case No. 89–1342 S. 1990 WL 120689 (D.Mass. June 19, 1990). In *Fulco,* general partners were alleged to have fraudulently bought out the interests of their limited partners at less than fair value. The limited partners alleged, *inter alia,* that in so doing the Defendants breached the partnership agreement. The court noted that a general partner's breach of the limited partnership agreement must be redressed in a derivative action unless the obligation is owed primarily to the other partners individually, causing them individual harm, in which case they could sue directly. *Id.* at *4. Concluding that this claim was derivative, the court stated that "where the loss is suffered proportionately by *all* the limited partners by virtue of their ownership interest in partnership assets, their injury is derivative." *Id.* Since the Class Plaintiffs here do not allege that the Class Plaintiffs were owed a duty separate from any duty owed all Funding Entity investors, this case is not dispositive.

The Third Circuit, applying Florida law, thoroughly analyzed the standing requirement and its application under both RICO and Florida common law fraud. *See In re Sunrise Securities Litigation,* 916 F.2d 874 (3d Cir.1990) (applying Florida law). Because of the similarities between *Sunrise* and the instant case, and the extensive discussion in *Sunrise* regarding this issue, a thorough summary of that decision is appropriate.

In *Sunrise,* Plaintiffs purchased certificates of deposit from Old Sunrise, a savings and loan institution. *Id.* at 876. Old Sunrise declared insolvency, but at that time Plaintiffs did not lose any portion of their Old Sunrise deposits. *Id.* The Federal Bank Home Loan Board thereafter organized New Sunrise, to which Old Sunrise's assets and liabilities were transferred. *Id.* Subsequently, the president of New Sunrise informed depositors that New Sunrise had the financial resources to insure its stability and solvency. *Id.* at 877. When the Plaintiffs' certificates matured, they rolled over the principal into new certificates with New Sunrise. *Id.* New Sunrise was later declared

insolvent, and Plaintiffs' investment was lost. *Id.*

Applying Florida law, the court held that "a shareholder may bring an individual action for injuries suffered directly by the shareholder that are separate and distinct from injuries to all other shareholders." *Id.* at 880. The court also concluded that a shareholder does not have an individual cause of action for damages that result from injury to the corporation. *Id.* Utilizing the principles that apply in shareholder suits in deciding whether depositors and other creditors have stated a claim that may be brought individually, the court noted, with approval, that a number of federal courts have also applied the same principles in other contexts to decide the question of RICO standing.[4] *Id.* at 880–81.

The *Sunrise* Plaintiffs' claim of fraudulent inducement was based on allegations that Defendants misrepresented Old Sunrise as a "well run and secure" institution in "publicly disseminated materials," and that Defendants failed to disclose that Old Sunrise was not financially secure, etc. *Id.* at 882. After noting that the asserted injury emanated from mismanagement, not fraud, the court stated that the *depositors' losses could not be separated from* the injury suffered by the institutions and *all other depositors,* and therefore the recoverable damages were assets of the institutions, and the Plaintiffs lacked standing. *Id.* (emphasis added).

The court rejected Plaintiffs claim that their injury was direct, distinguishing every case cited by Plaintiffs. *Id.* at 883–86 (distinguishing *Hinson v. Drummond,* 98 Fla. 502, 123 So. 913 (1929) (court permitted depositors to assert individual fraud claims against bank officers or directors; case involved officers who personally misrepresented the banks' financial position to an *individual* depositor, and allegations did not link the officers' conduct to injury to the bank or deposi-

tors generally); *Mallett v. Tunnicliffe,* 102 Fla. 809, 136 So. 346 (1931) (same); *Fagan v. Whidden,* 57 F.2d 631 (5th Cir.1932) (no allegation connected the fraud to any injury to the bank); *Wolfe v. American Savings & Loan Association,* 539 So.2d 606 (Fla.Dist.Ct. App.1989) (direct action maintained where Plaintiffs alleged separate injury to their individualized interests as preferred shareholders, rather than that of the corporation itself, and the corporation was not harmed by the Defendants' allegedly wrongful conduct); *Alario v. Miller,* 354 So.2d 925 (Fla.Dist.Ct. App.1978) (court declined to address the direct versus derivative issue altogether); *Adato v. Kagan,* 599 F.2d 1111 (2d Cir.1979) (Plaintiffs claim for funds placed in a bank now in receivership was not recognized by the FDIC because the funds had not been entered as deposits but instead were credited to several corporate accounts; recognizing that, as a general rule, "wrongdoing by bank officers that adversely affects all depositors creates a liability which is an asset of the bank, and only the bank or its receiver may sue for its recovery," the court concluded that *these Plaintiffs stood in a different position from other depositors* whose right to recover from FDIC had not been challenged) (emphasis added)).

The *Sunrise* court also noted that in *Chesbrough v. Woodworth,* 244 U.S. 72, 37 S.Ct. 579, 61 L.Ed. 1000 (1917), the Supreme Court found "no reversible error" in a lower court ruling that a shareholder could maintain a direct cause of action under the National Bank Act against bank officers who knowingly authorized a false report upon which the shareholder relied in purchasing stock. *Id.* at 885. The court noted that the *Chesbrough* opinion did not indicate whether the shareholder had stated a nonderivative claim, and did not disclose whether the directors' misconduct injured shareholders generally. *Id.* The *Sunrise* court noted that

---

4. Decisions involving corporate shareholders are instructive for actions involving partnerships. *See Ball v. Field,* 1992 WL 57187 (N.D.Ill.1992) (the rule that a corporate shareholder does not have an individual right of action against third parties for damages to the shareholder resulting indirectly from injury to the corporation as a result of injuries stemming from a diminution in value of the shareholder's interest in the corporation "applies with equal force in the case of partnerships") (citing *Allright Missouri, Inc. v. Billeter,* 829 F.2d 631, 635 (8th Cir.1987); *Klebanow v. New York Produce Exchange,* 344 F.2d 294, 297 (2d Cir.1965)); *Attick v. Valeria Associates, L.P.,* 835 F.Supp. 103, 110 (S.D.N.Y.1992).

the Ninth Circuit relied on *Chesbrough* in holding that shareholders may sue directly for diminution in share value. *Id.* (discussing *Harmsen v. Smith*, 542 F.2d 496 (9th Cir. 1976)). However, the *Sunrise* court also noted that this decision had not been adopted by other courts. *Id.* at 886–87 (citing extensive support).

The remainder of the *Sunrise* decision provides an analytical foundation for this decision. The court concluded that the rule that diminution in share value is an injury to the corporation is applicable to depositor cases:

> The loss in value of depositors' certificates reflects the impaired condition of the financial institution. *The injury*—loss of principal or interest—*is sustained by all depositors and is incidental to and dependent on injury to the institution.* Therefore, the institution or its receiver is the proper party to sue for the benefit of all depositors and creditors, or, after an unsuccessful demand, the depositors may bring a derivative action. The alternative, permitting depositors to bring individual actions for such injuries, would invariably impair the rights of other general creditors and claimants with superior interests. *See Rylewicz v. Beaton Services, Inc. [Ltd.]*, 888 F.2d 1175, 1179 (7th Cir.1989); *Rand [v. Anaconda–Ericsson, Inc.]*, 794 F.2d [843] at 849 [ (2d Cir.1986) ]; *see also Warren v. Manufacturers National Bank*, 759 F.2d 542, 545 (6th Cir.1985); *cf.* 3A Fletcher, *supra*, § 1282. *In our view, the fact that the officers' and directors' alleged fraud may have induced all of the depositors to make their original deposits does not justify bypassing this equitable and common-sense system for recovery, especially in circumstances like these, where all the depositors' losses are inextricably linked to the insolvency of New Sunrise. In cases like this, actions to recover losses on certificates of deposit sustained by depositors generally are derivative and belong to the institution or its receiver.*

*Id.* at 886–87.

Judge Aronovitz of the Southern District of Florida adopted *Sunrise* and held that a shareholder can, under Florida law, bring a nonderivative suit "for injuries suffered directly by the shareholder that are separate and distinct from injuries to all other shareholders, i.e., an injury separate and distinct from that sustained by the ... corporate entity." *In re Southeast Banking Corp.*, 827 F.Supp. 742, 745 (S.D.Fla.1993), *aff'd and rev'd on other grounds*, 69 F.3d 1539 (11th Cir.1995) (concluding that whether a claim is considered direct or derivative is a matter of state law) (adopting *In re Sunrise Securities Litigation*, 916 F.2d 874, 880 (3rd Cir.1990)). According to Judge Aronovitz, "[a] derivative claim is a wrong to an incorporated group as a whole that depletes or destroys corporate assets and, as a consequence, reduces the value of the corporation's stock." *Id.* at 745–46.

In *Southeast Banking*, the bankruptcy trustee of the holding company sued the officers and directors of a wholly-owned bank subsidiary, alleging breach of legal duties, negligence, etc. The trustee alleged that the claims against the officers were claims by the holding company against its own officers for duties owed to it, and not the bank, and therefore their claims were direct. The Court held that the allegations were based on acts taken by, and injury to, the bank, and thus were derivative. According to the court, there was "no meaningful distinction between injury suffered by the holding company and the derivative claims of mismanagement, especially where the [holding company's] solvency and success were 'crucially dependent' on the bank." *Id.* at 746.

Here the court notes, as a preliminary matter, that Plaintiffs have not alleged that members of the Class relied on separate information from that provided to Funding Entity investors who earned profits on their investments. The Class has admitted that "[b]y the fall of 1988, when the first dollars which are the subject matter of the Class Plaintiffs' ... claims were invested, the basic structure of the Premium fraud was in place...." Class Plaintiffs' Memorandum in Opposition to Motions for Summary Judgment (docket no. 2017), filed on August 16, 1995. Therefore, Plaintiffs cannot show a direct injury by fraudulent misrepresentations made to them as a subclass of all investors.

Rather, Plaintiffs' allegation is that because some investors profited from their investments by removing their funds from the Funding Entities before the fraudulent scheme unraveled, the damages suffered by the Funding Entities, which includes the profits received by these profiteers, is less than the damages suffered by the Class. Under the certification order, the Class includes only those investors who were injured by investing through the Funding Entities, *see* Order Granting Plaintiffs' Motion for Class Certification at 15 (June 27, 1996), and therefore the action is direct, not derivative.

The court in *Sunrise* dismissed similar arguments. In *Sunrise*, Plaintiffs alleged that because their losses, which were uninsured by FDIC, were not shared by the depositors whose deposits were covered by FDIC, their claim was direct rather than derivative. The court acknowledged that the Plaintiffs' damages were not suffered by all investors, but nevertheless concluded that the Plaintiffs lacked standing, stating:

> Plaintiffs contend that the loss they sustained was not shared by all other depositors; only those whose deposits were not fully covered by the FSLIC insurance limit suffered when New Sunrise failed. We are not persuaded that this factor distinguishes Plaintiffs' claims.

*Sunrise*, 916 F.2d at 888 n. 13.

Plaintiffs present an example to illustrate their point. Assume that two investors in a Funding Entity withdraw their funds before the fraud is discovered and profit by $20. Other investors lose their $120 investments. Overall, the Funding Entity loses $100. According to the Class, because the Funding Entity lost $100, while the investors left when the fraud unraveled suffered damages of $120, the investors' damages are direct because there is no identity of damages between the Funding Entity and these latter investors.

The Court rejects the Plaintiffs' view of derivative claims and the appropriate time in which to assess injury illustrated by the example. The appropriate time to consider the similarity of damages is the time at which the alleged injury occurred. In a claim based on *fraudulent inducement*, the injury initially occurs when the party is induced to invest. Thus, in Plaintiffs' example, the injury to both the Funding Entity and the investors is $100, since the profits that early investors withdrew from the Funding Entity can be recovered by the Funding Entity. Viewed in this context, the Class' reliance on language supplied by previous decisions that the loss must be suffered proportionately by *all* investors is justified. There is no indication other than that the Class members will receive a recovery directly proportional to the value of their investments, after factoring in any improper transfer to early investors.

Consider this discussion in the context of *Sunrise*. In that case, Plaintiffs alleged a direct injury based on the bank officer's alleged fraudulent inducement of their banking deposits. After the deposits were made, but before the bank's insolvency, the Plaintiffs could have withdrawn their full deposits, plus a profit (i.e., interest). Presumably, other depositors in *Sunrise*, just like the profiteers in this case, made that decision. While the *Sunrise* court, whose decision binds this Court, properly concluded that the loss suffered by the institution was identical to that suffered by the depositors, applying Plaintiffs' logic would lead to an inapposite result. If the *Sunrise* court had factored in every investor who withdrew funds prior to the bank's insolvency, then the loss suffered by the institution would not be identical to that suffered by the depositors, and the court would have pronounced that the depositors' claims were based on a direct injury. This, of course, the court did not do, because given the time lapse between the fraud and the discovery of the fraud, *any* transfer of interest during this period, be it a partnership interest, shareholder interest, or deposit interest, would establish such a direct claim. The court's conclusion is a logical and correct analysis of the standing requirement *as the facts were presented in that case.*

Plaintiffs orally raised an additional argument, not presented in their response to the Motion for Summary Judgment, that *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir.1995) establishes a "Ponzi" scheme exception to the rule enunciated in *Sunrise*. While this court disagrees that *Hirsch* con-

clusively creates such an exception, the court agrees that the underlying argument is worthy of consideration. Therefore, the court will examine *Hirsch* and the decisions on which it relies, including *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979 (11th Cir.1990), and *Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir.1988), to determine whether the presence of a Ponzi scheme warrants the application of a separate rule.

In *Williams*, the debtor (Chacklan Enterprises, Inc.), a distributor of Mexican seafood, sold investment contracts to individual investors, with a bank serving as the debtor's depository. 859 F.2d at 665. After the investment program collapsed, the trustee sued the bank on behalf of the estate *and* the investors, alleging securities law violations arising out of the bank's participation in the "Ponzi" scheme. *Id.* Since the trustee *and* the estate would recoup only administrative costs from a favorable judgment, and the investors would receive the bulk of any recovery, the court noted that the "investors plainly remain the real parties in interest in these actions." *Id.* As a result, the court held that the trustee lacked standing because the money was owed to the investors, not the estate. *Id.* at 666–67. In reaching this conclusion, the court realized that because Chacklan Enterprises and the bank stood *in pari delicto* in committing the fraud, the bankrupt company had no claim against the bank. *Id.*

In *Hadley*, customers of GIC Government Securities, Inc. ("GIC") paid GIC money for securities that GIC purchased from E.F. Hutton ("Hutton"). 901 F.2d at 981. Instead of transferring the securities to its customers, GIC diverted these funds for its own purposes. *Id.* There was no evidence that GIC had any ownership interest in the securities. *Id.* at 985. GIC later filed for bankruptcy and George Hadley ("Hadley") was appointed trustee. *Id.*

Hadley sued Hutton for, among other things, negligence and conversion of securities. *Id.* at 981. The claims Hadley raised were based on the securities fully paid for by GIC customers and purchased from GIC. *Id.* The Eleventh Circuit held that since Hadley as trustee had no possessory interest in the securities, he lacked standing to bring the claims against Hutton. *Id.* at 985. The court further noted that since the injury was caused by both Hutton and GIC (for misappropriating their clients' funds), GIC customers could pursue causes of action against either GIC or Hutton. *Id.* In concluding that the claims properly belonged to the creditors, the court was mindful that because GIC and Hutton stood *in pari delicto,* GIC had no claim against Hutton. *Id.* at 987 (approving *Williams*).

In *Hirsch,* the trustee for the Colonial Realty Company ("Colonial"), sued Colonial's accountant Arthur Andersen ("Andersen") alleging, among other things, violations of RICO.[5] 72 F.3d at 1088. Colonial, the general partner of numerous limited partnerships, allegedly participated with Andersen in fraudulently issuing memoranda to induce individuals to invest in limited partnerships which were nothing more than elaborate "Ponzi" schemes.

The Second Circuit, in affirming then Chief Judge José Cabranes, noted, as did the courts in *Williams* and *Hadley,* that "the trustee stands in the shoes of the debtors, and can only maintain those actions that the debtors could have brought prior to the bankruptcy proceedings." *Id.* at 1093. The court concluded that the claim predicated upon the distribution of misleading memoranda to investors was particular to the investors in the limited partnerships, and not Colonial, the general partner and alleged fraudulent participant. *Id.* Consequently, the court held that Colonial's trustee could not raise these claims, which belonged to the individual limited partners, against Andersen. *Id.* (citing to *Williams* and noting that in *Hadley* the Eleventh Circuit also held that claims arising out of a Ponzi scheme belonged only to the defrauded investors, and therefore the trustee lacked standing to sue because the bankruptcy trustee could not seek to collect money not owed to the bank-

---

**5.** This case is related to *In re Colonial Limited Partnership Litigation,* 854 F.Supp. 64 (D.Conn. 1994), discussed *supra.*

ruptcy estate). Elsewhere in the opinion, the court also noted that the trustee would be precluded from bringing certain claims against Andersen because of the debtors' collaboration in promulgating and promoting the Ponzi schemes. *Id.* at 1094.

Although presented as claims by trustees, *Hadley, Williams,* and *Hirsch* all address the same issue presented here: whether a corporation (either on its own behalf or through the trustee) or its investors (or both) has standing to raise claims against certain third parties. However, there are many important factual differences between this case and *Hadley, Williams* and *Hirsch.*

*Hadley* is not instructive because in that case the court determined that the subject matter of the litigation was owned by the investors directly, not the corporation in bankruptcy. Unlike in *Hadley,* there is no dispute here that the investors' money was placed in separate Funding Entities, and that the Funding Entities in turn invested in the Premium Corporations.

*Williams* is also distinguishable. In *Williams* the corporation in bankruptcy conducted legitimate business as a food distributor and, as a result, the bankruptcy estate included other creditors besides the investors. Here, however, the Funding Entities were not corporations with industrial output or partnerships engaged in the production of goods or services. The Funding Entities had no independent existence other than to collect money for investment in the Premium Corporations. As a result, any recovery by the Funding Entities will flow solely to the Funding Entity investors, not other business creditors.

*Hirsch* is likewise distinguishable. In *Hirsch,* the debtor was only one investor in a defrauded limited partnership. Because the debtor allegedly participated in the fraudulent activity, the claim against the co-participant belonged to the limited partners, not the general partner debtor. Here, on the other hand, the investors invested *in,* as opposed to *with,* the Funding Entities. Furthermore, in this case all of the investors were similarly defrauded, and there is no evidence that any of the investors participated in the fraud.

The significant, overriding factor presented in the three previous decisions is the *in pari delicto* relationship between the Defendants and the corporation (represented by the trustee) that sought to bring the claims. Indeed, while *Hadley* and *Hirsch* can be distinguished from *Sunrise,* in the absence of this *in pari delicto* distinction, *Williams* and *Sunrise* appear to be inconsistent. In *Sunrise,* investors were defrauded into investing (depositing funds) in a bank. The court held that the bank, and not the limited group of investors (depositors) who lost money, had standing to sue for the loss. Similarly, in *Williams* the investors were defrauded into investing in a distributorship. However, the Ninth Circuit held that the investors, and not the trustee representing the distributorship, had standing to sue for the loss. The difference in the two cases is that in *Williams* the trustee and the Defendant were *in pari delicto,* thereby precluding a successful suit by the trustee against the Defendant. In *Sunrise* there was no *in pari delicto* relationship between the bank and the Defendants (the bank officers) precluding a suit by the bank.

Similarly, here there is sufficient evidence to indicate that the Funding Entities (according to Vons, the proper parties to bring suit) were *in pari delicto* with the Premium Corporations in committing this fraud against the investors. This Court expands the analysis of *Hirsch,* highlighting the importance of the *in pari delicto* relationship. Where a business entity exists solely as a fund raising conduit for another enterprise, and both the fund raising entity and the primary corporation are culpable participants in a scheme to defraud the investors, the investors have standing to raise direct claims against all participants in the fraud.

The court notes that Funding Entities representing over half of the Plaintiff Class have also filed claims against Vons raising essentially the same claims as the Class Plaintiffs. Ordinarily, this would indicate that the parties have a strong interest in the subject litigation. Here, however, the Funding Entities' claims were raised after the Class brought their claims, and were asserted merely as a defensive response to

the claims raised against them. The Funding Entities have indicated in Open Court that they have no real interest in the litigation. Rather, these claims are raised only to preserve rights that would exist were the Eleventh Circuit to overrule this court's order on standing.[6]

The Class Plaintiffs have repeatedly argued that they should not have to rely on the Funding Entities, who they allege participated in the fraud, for any right to recovery. Interestingly, on this issue of the Funding Entities' participation in the wrongdoing, the Grocer Defendants agree. There is no reason to require the Funding Entities, who have no real interest in pursuing the litigation, and who allegedly participated in or had knowledge of the fraud, to raise the claim and deny the investors, the real victims, the right to seek recovery for their losses. However, should this court find that the evidence presented at trial is insufficient to demonstrate that the Funding Entities were participants in or had knowledge of the scheme to defraud the Class, then the court will revisit this issue of standing pursuant to Federal Rule of Civil Procedure 50.

Plaintiffs have alleged that they have suffered a direct injury at the hands of Vons, Pueblo and Stanford because they were induced into becoming investors in the Premium Corporations by, among other things, the verification of grocery transactions. The relationship between the confirmations and the investments as well as the Defendants' knowledge of the individual codefendants' actions are questions of fact for the jury.

WHEREFORE, the Defendants' Motion for Summary Judgment for lack of standing is DENIED.[7]

---

6. The Court has previously separated the Funding Entity claims. However, in view of this Order and the oral representations made by counsel, the Court will consider dismissing the Funding Entity claims for lack of standing after the class action trial. The Court will also entertain arguments regarding the Receiver's standing to bring claims in the companion case presently stayed until, at least, this trial is completed.

7. The other grounds raised by the Defendants in their Motions for Summary Judgment are also rejected but will be discussed in a separate order.